Office of the U.S. Trade Representative, 2023-1891. Mr. Shrell. May it please the Court, Pratik Shah for Plaintiff Appellants. The substantive dispute in this case boils down to whether Section 307's limited, quote, modification authority hands USTR a blank check to raise tariffs by virtually any amount for virtually any reason. The unprecedented List 3 and 4 actions radically- to yourself a good service- than you say virtually any amount for virtually any reason. There are admittedly general but specific standards in all parts of A, B, and C. I know A is not at play here. B and C are. And I think you take most offense to C, which just says is no longer appropriate. But that's a standard. Okay, sure, Your Honor. Let me start maybe just to make it more concrete with the term modification, right? Because that cuts across all three of the provisions A, B, and C. So the term modification does not permit transforming a limited $50 billion tariff action into a $370 billion. Because, as both the US Supreme Court and now this Court have reinforced, opinions that were issued after the CIT's decisions modify- and this is coming straight from the Supreme Court, which this Court adopted in Solar Energy- connotes a moderate, minor, or incremental change, not massive radical escalations in tariffs, on the order of $50 to up to $500 billion, a tenfold escalation. That's coming straight from the Supreme Court and this Court in Solar Energy. And whether an expansion is moderate or not. I mean, this seems to be something that- the amount seems to be something that lies largely in the discretion of USTR. Let me ask you a hypothetical. If they'd done this investigation and determined in the first instance that $300 billion was the right amount, you wouldn't be challenging that, right? No, Your Honor, because they would have had to do, in the course of the investigation and in the course of the report, that $300 billion was the right amount based upon the harms. And here- Based upon the harm? What do you mean? Based upon the investigated practices. Right, because that suggested that you were saying there was some kind of requirement in the statute that there would be correlation between the monetary harm to the economy and the monetary harm of the tariffs. No, that's not true. That's not true, and I'm not saying that there is a proportionality. USTR can pick whatever tariff it wants to address the offending action. I am not disputing that. What I'm disputing is, once they pick a number, a baseline tariff action, as they did, based upon the report, the investigation, exercising all their judgment and discretion, we're not challenging the list one and two tariff actions that were at $50 billion. What they can't do, after going through those panoply of procedures in 301, 302, 303, and 304 to come to that number, they can't then just turn to the modification provision, which is supposed to be for adjustments, that had to be moderate, modest- But that parenthetical is not in the statute. Which parenthetical? Which is supposed to be for adjustments. Well, but what is in the statute is modify. And just to be- Why, in conclusion, is this was our original action. It was entirely insufficient to cause China to correct its bad conduct. And in order to address that bad conduct and attempt to entice them to do it, we're going to increase it from $50 to $300 billion. Well, the reason why is when you're doing that sort of massive escalation, and I think any trade lawyer, any layperson, and hopefully the judge would agree, that is a massive escalation from $50 billion to $300 or $500 billion. The reason why is Congress had good reason. If you're going to do that, that's not a modification. That is something that you can do that, Judge Hughes, but then go through the procedures in 301, do it in investigation. Okay, I get it. I mean, that's a good argument.  The opposite argument is Congress, in enacting the statute, wanted to encourage the president and the trade rep to give them more flexibility and more power to deal with these trade issues. And one of them was giving them this kind of authority and giving them the ability to modify it. So you've got to let me finish. Sure, sure. Again, I'll interrupt you. It's nice being on this side. Yes. But they gave them the ability to modify. Why do you think Congress would have said, okay, if your first action is insufficient and you find it's insufficient, you have to start all over again to address the same problem rather than just upping the ante as they did here. What they did seems like maybe not always the normal diplomatic way of doing things but a possible diplomatic way of doing negotiations. Right. And why do you think Congress wouldn't have wanted them to have that ability and not have it hamstrung by the requirement to restart a new investigation every time it wanted to increase it by a certain amount? Sure. So we're not saying that they can't ever do that. Congress gave them an avenue to do that if they follow the requirements of subsection B and find that the burden is increased. And you asked me why would Congress have hamstrung them. There's good reason why Congress would say that you can't take a relatively modest trade action, $50 billion, and then shoot it up to $300 billion or $500 billion or any amount. Do you have anything that the legislature can do to support that? Yes, I do, Your Honor. In fact, in the 1988 amendments, they transferred the authority from the President to the USTR and they set very specific modifications, A, B, and C, and they used the term modify. And here's what this court said, and I think this is critical. In the solar energy decision from just last year, which took another modification provision but from the Trade Act, uses the word modification. Here's what this court said at page 901 of its decision. It says, quote, The trade court seems to have been persuaded to adopt the contrary view due at least in part to its concern that the government's interpretation of modification risks permitting absurd results, e.g., a 1% initial tariff followed by a 50% modified tariff with no cost-benefit analysis of the 50% rate and might allow the modification exception to swallow the rule. We do not share this view. On any reading, a modification must be a relatively minor adjustment. Expansion of a 1% duty to a 50% duty is obviously not a minor change. So this court took the exact argument that you're reading. Which provision did this apply to? This applied to the modification provision, which is the exact same language in 2254. That uses the exact same modification term there. Now, in that case, it was the president who had the modification authority instead of USTR, but it was the same. The president sets an initial safeguard duty in that solar energy case and then has the ability to modify it. It's the same language. And the government doesn't dispute this in its reply brief. Solar energy came out after our opening brief. The government... I'm sorry, I just got to it. Okay. 2254, what are you pointing me to? So, 2254 gives the power to reduce, modify, or terminate a safeguard action. Yeah. And so... 2254B. I think it's B1. I can't find the language. But yes, it uses the same term, the modification. And what the court at 901 was addressing is the challenger said, hey, wait a minute. This modification provision was giving too much power to the president. He could do an initial tariff action, like under 301, right, for 1%, and then he could say in his judgment, because it wasn't effective and it's harming the domestic industry. I get what you're arguing, but honestly, this is all textual, and the language in that provision has a lot more conditions on it than the language we're talking about in BNC. Well, Your Honor, what this court is construing was just the term modify. I agree with you. ABNC has other limitations. You can't construe modify out of context. The problem I'm having with your argument is not so much that. It's who is to decide what's a modification and what's such a dramatic expansion that it's not a modification. Well, you know from the Supreme Court that it's the court that has to decide that ultimately whether something is a modification. In the Biden student loans case, it was, hey, is this... I get it. I don't really want to talk about that case. I understand why you're relying on it. Sure. Let me put that aside. I don't think that kind of stuff, that non-delegation stuff, is going to be applicable to the problem we're having here. Let me ask you this. If they had went from 50 to 100, would that have been a modification? Your Honor, that's a closer call. I don't know. I think that's getting close to it. If they went from 50 to 100 and it didn't work, could they have gone then to 150? No, I think when you're talking about three, four, five, it certainly says... You're asking me to decide what's a modification and what's not. Well, Your Honor, yes. That's the statutory term. I'm asking you to construe the statute. And this court in solar energy, I just read you the hypothetical. They said specifically, this is from a binding precedent of this court last year. It said, hey...  Dicta, Your Honor, but construing the exact same term in the Trade Act in a hypothetical that's on point that says, hey, if they wanted to do a modification from 1 to 50%, they say, obviously. This court said, obviously, you can't do that under a modification. But, again, what if, obviously, they actually explained why that was an appropriate modification and wasn't a change? It's not about appropriate. It could be the most appropriate thing in the world, right? There's all sorts of findings that it has to be 50% to protect the industry. That's what the argument was assuming that. So we're getting into a lot of stuff that's kind of higher level based. I want to get you back to the specific statutes here. Sure. And I want you to know how much time left, but I would like you to focus quickly on B and Y, because I think your best argument is on the strict textual interpretation of B. Okay. But then I want you to address, because the CIT didn't get there, but why, even if B doesn't work, and setting aside this modified discussion we're having, why C doesn't work. Okay, so setting aside modify, then the subsection B, under subsection B, section 307B, the capital B, authorizes a tariff increase only when the burden to the U.S. economy from the acts, policies, or practices that were the subject of the 301 investigation has increased. But instead of finding an increased burden from those investigated practices, USTR relied predominantly on China's retaliatory tariffs, currency manipulation, and other policies. But the plain text of B, if you want to focus on subsection B, forecloses reliance on those subsequent actions, none of which were the subject of the 301 investigation. Instead, it has to be of the acts, policies, and practices that are the subject of the action. The investigation was predicated on... And let me just interrupt you, because I understand where you're going with this. It seems to me that the CIT looked at this and said, yes, it's a plausible reading, but another plausible reading of acts, policies, and stuff is not limited to just the specific ones, but the overall problem that China is stealing our IP. Let's just phrase it like that. Whatever you want to say, maybe I shouldn't be saying that. China has practices that disparately impact our IP. And if that is the problem, and we investigate that and say, we're going to impose this to try to get you to correct it, and they respond with retaliatory tariffs, isn't that increasing our burden to respond and resolve that problem? It is increasing the burden. Nobody disputes that the retaliatory tariffs... I think that's what the CIT said, right? What they said is it's connected to, right? They said it's connected to, linked to, it's a subsequent defensive measure designed to maintain the acts, policies, and practices that were investigated. The problem is the statute doesn't... Congress knows how to write statutes, I'd say, related to... Let me jump in here. I'd like to get one question in. Yes, please. And that is this. If we get past the Argonaut Modify, and we look at B and C, and if I agree with you that under B there's no increase, how under C, if we put in a $50 billion tariff, and in response China puts in a $50 billion retaliatory tariff, how is it that we can't rightfully say that our original tariff is no longer appropriate, and therefore we can bump ours up? How come C doesn't get you there? So I think there's good reason the CIT didn't rely on C, and I think there's... Let me give you three textual signals as to why you can't rely on it. I don't know how they do things here, but when judges talk, lawyers stop talking in court. So let's not talk over each other. Okay. Sorry. Apologize. I think there are three textual signals that I would point to as to why you couldn't use C. One is the symmetry with 301B. 301B empowers USTR to impose the tariff if it finds the policy is discriminatory. And two, the action by the United States is appropriate. That's the threshold condition for it to impose a tariff. So then when C says it can take further action when it is no longer appropriate, to me that stands in contrast to when it can impose it when it's appropriate. Isn't it a logical reading of C to say, we put up 50, and instead of reversing their conduct, they hit us with 50. And can't you take from that, well, our 50 is not working. It's no longer appropriate. It's not achieving our intended result. Therefore, we need to escalate. Right. So if it's not persuasive that appropriate allows you to do it, if it's no longer appropriate, that should only allow you to go down and unwind. The second signal I would point to is it would render subsection B superfluous. Subsection B says you can increase the tariffs if you find an increased burden from the investigated practices. B says increased or decreased. Increased or decreased, correct. But if under C you can just increase it because you find it no longer appropriate, which the government argued in the CIT was not a judicially manageable standard, that is, there's no way for courts to review that, well, then there's no circumstance where the government would actually have to do the hard work under B to show the increased findings in order to increase the burden. And it would render it superfluous in discretionary action cases. They would always act under C because they could just say it's no longer appropriate. The third textual signal I will give you is subsection C, in our view, is in parallel to subsection A. So how 307 works, which is on page 8 of the addendum, if you want it handy, is subsection A, which applies to mandatory trade actions, everyone here agrees, the government and we agree, that that only allows USTR to go down in the tariff action. B, of course, allows for both mandatory and discretionary actions to go up or down if you make the requisite finding. C is the parallel subsection to A, and the legislative history, which is quoted in our brief, kind of bears that out. We've got any authority that says C can only bring down? This is the first case that done it, and what I would say in the history, yes, the answer is no, what I will say is in the history of the Trade Act, the government has never used subsection C to increase a tariff. Every time they've used it, there have been five times in the history, and we lay this all out in our brief, we've always said no longer appropriate is we're gonna decrease or terminate or pause the action. So if we have... Counsel, you have consumed your time. I will give you some rebuttal time. In the meantime, let's hear from the government. Please, Your Honor. May it please the court. I'll start with SEIA, which does interpret modify also in the context of the Trade Act of 1974. If I can interrupt you first. Does C only mean go down? No, it does not. And we know that for a few reasons. One is the only words we can really interpret for C are modify, which I'll explain more about modify. That's a broad, open-ended term, as this court said in SEIA. And then the other words we have in subsection 1C are no longer appropriate. So that refers back to 301B, which authorizes all appropriate and feasible action to eliminate the unfair practice. And there's a memorandum explaining that, for example, at appendix page 5923. And so when it's saying no longer appropriate, it's exactly what the court's questions indicated, that the first action, and what happened here, the first action was the president directed, the trade representative used predictive judgment to say 50 billion. We think 50 billion will be sufficient to obtain elimination of these practices. It wasn't. China did not eliminate the practices. They instead doubled down and imposed 50 billion defensive measures to defend those same practices. And so clearly the predictive judgment turned out to not be correct. So it was no longer appropriate. Different action was appropriate. How is that retaliatory 50 billion for China evidence of an increase under B in the four factors that were originally considered and acted on? Yes. And this is also explained in the record, for example, at the president... What is an increase? Is it the number of bad acts? Is it the scope of the bad acts? Even if the number is less? Is it the monetary impact? What is increase? It's the increase in the burden on U.S. commerce. And the parties agree that there was... But there was an increase there. Right. Well, the parties agree there was an increase. I think the disagreement is, were the defensive measures subject, the subject of the acts, policies, and practices? I think the key word here is acts, policies, and practices. The key words are acts, policies, and practices. Practices is not a one-time thing. The whole issue here is, as explained in the investigation, these technology transfer practices were ongoing for a long period of time, years and years and years. And the practices are ongoing. They were investigated in the 301 investigation. But ongoing is not more. Ongoing is a continuation. It's not an increase. Right. So the point is, the subject is the practices. And the retaliatory action that was China's defensive action of the 50 billion, that retaliation was part and parcel of the acts, policies, and practices that were investigated. And I think the Court of International Trade correctly recognized that the defensive measures inherently, because they're defending the wrongful, unfair practices, they're inherently part and parcel of them. But even beyond that, in the investigation itself, for example, appendix page 1573, the initial investigation recognized that the retaliation had always been part and parcel of the technology transfer regime because China would discourage companies from speaking out or opposing the technology transfer practices precisely because of the retaliatory measures. And that retaliation, appendix page 1573, the trade representative found, had allowed these practices to persist for decades. So the fact that China, after the trade representative subjects the president's direction, took this action, lists one and two, the fact that China retaliated, that was part and parcel, again, of the unfair technology transfer. I just want to see how it's an increase. Right. And so I've been talking about subjects, and that's really where the dispute is. The reason it's an increase in the burden on U.S. commerce is because now not only are U.S. companies reckoning with the technology transfer, the wrongful action there, which the president said represents a grave threat to the long-term health and prosperity of the American economy, at appendix page 6159, not only is there that, now they're also reckoning with having to have higher tariffs on their exports to China. So that's the increased burden. And it's all happening part and parcel of the original technology transfer actions. And your view is that the increase in burden doesn't have to be specifically on the sector of the economy relating to these four IP subcategories, but it's that the practices that enforce those restrictions and are harmful are part of, that the retaliation is part of that, and that altogether leads to an increase in the burden. That's right. I mean, I get the argument that's the way the trade court looked at it. It's not the cleanest textual reading of this. Well, I think it is, and it's inherently a factual question, because the... No, I mean, back up. If we say actually, except your friend's argument, that the burden, the increase in the burden that the USTR has to show is not just generally on the economy, but there's been an increase on the burden to the economy from these Chinese unfair practices regarding IP, that's different than what's shown here, isn't it? Apart from some very general statements. You didn't say, look, our IP sector, they haven't, because of this action, they have stolen more, or they've done more hacking, they've forced more technology transfer. You didn't do any of that kind of stuff. You didn't try to specifically tie the increase in burden to the four subcategories. Well... Isn't that what that are the subject of the action means, indeed? The subject... Those are the subject of the action, the IP text. The practices. Yes. And the practices are ongoing, and the defensive measures are part and parcel of those practices. So that is the issue. And it is a factual question, and it does depend... Let me try to ask my question one more time. You're trying to have practices be broader than the specific identified four subparts. It is practices are the overall thing identified in the... It's clear throughout that the USTR and the President is worried about not just those four specific things, but what China is doing with regard to our IP. And that the practices to do that, China undertakes a lot of things to keep those practices in place, and that by retaliating, they're making an even greater burden to get China to respond to that. That's the way I read what the trade court did. I think that's what you're arguing. But I think you would agree, or I would hope you would agree, that if you had to show that the increase in the burden on the US economy came specifically from an increase in activity under those four things, that retaliation is not part of those four things. So, we're making two arguments. And you've accurately described the first one, that is, by defending the practices through the retaliatory measures, they are inherently part and parcel. The second one is what the Court of International Trade explained in its second line, which is actually the four issues themselves are broad. The investigated practices are broad, and that's why it's important, for example, at the 3, also appendix page 1561, that's the investigation into the four investigated issues. And retaliation is specifically mentioned as one of the tools that was used for technology transfer. So, technology transfer was achieved through a number of ways. You know, vague licensing regimes. There's a lot of different methods by which China achieved the transfer of IP and technology from US companies to Chinese entities. And one of them is the threat of retaliation. So the second line point is even if the Court takes a restrictive statutory view, the factual view is that the investigated practices were broad. They were broad in the included retaliation. So... Can I, just before you run out of time, or because it's going to take a while, can we get back to C? I have a specific question, but I want your response, which I think you were going to start with on that case in the modify. But the specific question is if that view of C, the broad view that it will allow an increase when appropriate, is textually correct, why doesn't that swallow up B? And then also, can you address why? Because I think that fits in with modify here, too. Right. So the first, the front line answer for the superfluity argument is the mandatory actions under B. Regardless of whether in this case, for example, or in discretionary cases under Section 301B, 307, 1B and A1C could overlap. Regardless, in the mandatory context, 1C would not apply. So I think that's enough to say this is certainly not superfluous. The superfluity standard doesn't say in every single case the statutory provisions must have different application. And so the fact that it's overlapping here isn't a problem. So for the mandatory actions you have to modify or terminate, you have to comply with either A or B. You can't just do it under C when appropriate. That's a discretionary thing only. And so that ties in with a more discretionary framework when it says no longer appropriate. Yes, and that fits in. I think what the Court was discussing earlier as well with the 301 action under the mandatory authority under 301A is there needs to be a link to the actual compensatory amount of the burden, whereas that's not true under the discretionary authority. So the 307 B 1B, A1B authority links up with that. So regardless, under the mandatory analysis, that would still apply. And then there's just the plain language issue. So the overall question in statutory interpretation is the plain language. So under A1C of section 307, we're looking to the plain language. The plain language we have is the discretionary term appropriate. That's a broad delegation. It refers back to section 301B. And an important point I want to emphasize is that our friends on the other side agreed that this action would be appropriate if it had been taken under 301B. But the issue is that the authority and obligation in 301B doesn't go away after the one year. The one year timeline to issue the initial action was imposed in 1988 to spur action. So I think a helpful case here is a trans-Pacific case. There the court said when there's an obligation to act by a date certain, it's two obligations. One is the obligation to act. Two is the obligation to act by that certain date. Even if that date has passed, the first obligation remains. So 301B, that broad authority to take all appropriate and feasible action continues throughout. It continues after that one year. It continues throughout the modification period. And it continues in the four-year review. So this is an ongoing obligation. And the plaintiff's interpretation of modify is just not consistent with that ongoing obligation. It's also not consistent with the court's analysis in SCIA. The provision that plaintiff's pointed to in SCIA is really focused on section 2254, slowing the rule in section 2251. That's the issue there. The interpretation of modify in SCIA is helpful because it talks about the statutory definition of the Trade Act 1974. That definition is completely inconsistent, again, with what the plaintiff's saying modify means. They point to Biden and MCI. Those are two cases where agencies were modifying statutes. So in Biden, for example, the call the court had was the agency was making a basic and fundamental change in the scheme designed by Congress. Here, what's happening is the trade representative, subject to the president's direction, is modifying its own prior act. So this is not an agency changing something Congress did. This is something more like an agency that has the power to act, has the power to reconsider, as the court said. Do you think there comes a point where a court could step in and say the increase is so dramatic that it's no longer a modification but is a completely new action under the guise of a modification? No, I don't think so because the way that modify is used in the Trade Act is different, again, than Biden and MCI. And we know that because the problem in MCI, for example, was the agency eliminated a provision of the Communications Act. And the court said, eliminating, that's not a modification. In this Trade Act 1974... So hypothetically, if they go and do an investigation on this IP stuff and they impose a relatively low-level amount and they decide China's not complying, but maybe they don't say this on the record, but it's very, very clear from what's happening, they have another problem with China over some other kind of industry. And they modify the penalty in this one to address that entirely different industry and impose a trillion dollars of tariffs on something that has no relations whatsoever to the IP. It's not designed to gain compliance with their request in the IP sector, but they just use this authority, which is very broad, as you've said, to modify this and add what is essentially a new set of tariffs. Is that okay? The way to assess whether that's okay is to look back to Section 3. There would still be the modification criteria, but the word modify itself would not be the limitation there. The modification criteria, the increase or decrease in burden, are no longer appropriate. And then, again, referring back to the underlying action would have to be authorized under Section 301B, assuming it's discretionary. So that would be the analysis. And that is something that you think might be justiciable? No. See, this is my problem, is I don't want to open this up to say, okay, you can do this in response to these trade practices with regard to IP, and then all of a sudden, China and the U.S. blow up into a huge dispute over Taiwan, and they come in and say, we're imposing 100% tariffs or 200% tariffs on every single import from your country and rush you back down from Taiwan. So, on the justiciability... Right, that's clearly not connected to the original action, and it's by any definition not a modification. It's a new action. I think there, part of what the hypothetical is getting to is maybe the increase and decrease burden that... I don't care if it's under B or C. I think B is more, would be more constraining on you. C, as we're talking about it, does not seem to be. How would... And I know you have to say this justicially reviewable stuff, but it is a very hard sell to tell me that there is no way a court could look at... Let's just assume they actually stated on the record and said, look, we don't care about the IP stuff anymore, but we're going to use the authority that we're given under 24-7 A1C to impose a trillion dollar tariff on your economy because you invaded Taiwan. That seems to me to be... I mean, let's just assume you agree that's inconsistent with the purposes of this statute. How do we review that? You're asking my time to expire. May I answer? You can answer the question. Okay. I appreciate it. The way... There's two different issues potentially that could arise. One is, if it's the president directing the action, what the court has said... Let's just assume it's USTR so we don't have to get into that. Okay. If it's the USTR, what the court has said, I think maybe in GILDA 1, is they've made the point that even if findings are reviewed very differentially, particularly in this area of foreign affairs, the finding does have to be made. I think that's one piece that is important there. The analysis would be different under... If it was the president acting, of course, that would impose many different limitations that are a feature, not a bug, of the way the APA system works. Right. May I make one concluding thought? You may express a concluding thought. Yes. The last point I'd like to make is the plaintiff's interpretation of modify is inconsistent with the meaning, the definition provided in the Trade Act, which includes completely eliminating and, as the court said in SCIA, has no upward limitation. It's open-ended in both directions. So, we already know that's different than the way that the term was used in MCI, and we'd ask the court to affirm it. Thank you, counsel. Mr. Shaw, we'll give you three minutes for rebuttal. Thank you, Your Honor. If I can make three points in my three minutes. First, I won't repeat the whole independent modify argument, but I will point out that the government, neither in their brief nor argument today, disputes that a seven-fold increase in tariffs is not a minor or incremental change. Forget about Biden and MCI. Under this court's decision in Solar Energy, a magnitude of change that is not minor or incremental is not a modification. That's just in black and white. Respond to opposing counsel's argument that the retaliatory tariffs were part and parcel of the underlying problem. If part and parcel gets you there under B for an increase, then how is anything other than absolute silence not part and parcel? I agree. B is very specific. It has to be the investigated practices, the burden from the investigated practices, not things that are connected to, linked to part and parcel in some broad sense. She cited a couple times where the word retaliation appeared in the report, but if you look at those pages, 1561 of the appendix, 1573, it's very specifically talking about individual companies who refuse to turn over their IP, then China might retaliate against that specific company by, for example, denying them a license. That is miles apart, just completely different than countrywide retaliatory tariffs that were never investigated. The Trade Act knows how to talk about retaliatory tariffs. Thank you. That was actually my, that was going to be my second point. B was the sole basis of CIT's decision. Under the plain text, that decision fails for the exact reason, Judge Gilstrap, that we've been talking about. Again, modify is an independent argument, and there's good reason to think that Congress won't, and everyone agrees, these list three and four is an upwards of a $75 billion tax on consumers, is what it turns out to, those statistics. I just wanted to ask, because you noted correctly that the trade court didn't rely on C. If we determine that C is appropriate legally, is there anything to prevent us from getting to C and saying, we may have to send it back to the trade court for factual findings, although I don't know. I don't think factual findings, I think this court should. Let me just ask you that. If we agree that C is legally permissible to do an increase, I know you disagree with everything I'm about to say, is it legally permissible to do an increase, and the increases here are not so big as to not be a modification, then is there, can we affirm on that alternative basis? Because they've made all those findings under CIT. I think you can, but let me, with my last point, if I may just address that C, the alternate ground, is I think back to your colloquy, it does swallow up B for all discretionary actions. There will never be a discretionary action where USTR ever has to find an increase in burden if it allows them to do it up. And the last, and I think critical point, which we make in our brief, is if it really is not a judicially manageable standard, as the government has argued, no longer appropriate, that is, a court can't review that, they can pick whatever number they think makes it appropriate, that runs into canon of constitutional avoidance with respect to the non-delegation doctrine. If there's any doubt about it, this court has to find the plausible reading that would avoid that unlimited and unreviewable power to take, Judge Hughes, as you said, a $1 million trade action on a discrete thing, and ratchet it up to a $1 trillion trade action on all trade with whatever country the court wants to, that runs smack into non-delegation doctrine problems, and you don't have to find a violation, you just have to say there's a serious question, and so we shouldn't read, we should read C like we read A, they can only go down. Thank you, counsel. Thank you. The case is submitted.